## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GAUTHAM YATHAM and ROBERT WALTERS**, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**TD BANK, N.A.,**<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Gautham Yatham and Robert Walters, individually and on behalf of all others similarly situated, hereby bring this Class Action Complaint against Defendant TD Bank, N.A. ("TD Bank") and alleges as follows:

## INTRODUCTION

1.      This lawsuit is brought as a class action on behalf of Plaintiffs and thousands of similarly situated customers of TD Bank who have signed up for the Zelle money transfer service and who: have been the victim of fraud on the Zelle service; who have incurred losses due to that fraud that have not been reimbursed by TD Bank; and who were entitled by the marketing representations of TD Bank regarding the Zelle service and by the TD Bank's contract promises to a full reimbursement of losses caused by fraud on the Zelle service.

2.      Zelle is a person-to-person ("P2P") payment transfer service wholly owned and operated by seven of the largest banks in the U.S. Person-to-Person payments allow a consumer to send money to another person without needing to write a check, swipe a physical card, or exchange cash.

3.      There are approximately 1,500 member banks and credit unions who participate in the Zelle service. Those members engage in their own significant marketing efforts to encourage their accountholders to sign up for the Zelle service by marketing Zelle as a fast, safe and secure way for consumers to send money. This is false. In fact, there are huge, undisclosed security risks of using the service that TD Bank omitted from its marketing push to get its accountholders to sign up for Zelle.

4.      TD Bank prominently touts Zelle to its accountholders as a secure, free and convenient was to make money transfers. However, it misrepresents and omits a key fact about the service that is unknown to accountholders:  that there is virtually no recourse for consumers to recoup losses due to fraud.  Indeed, <u>unlike</u> virtually every other payment method commonly used by American consumers—debit cards, credit cards, and checks—there is a no protection for accountholders who are victims of fraud, and virtually no recourse for accountholders attempting to recoup losses due to fraud.

5.      The unique, misrepresented, and undisclosed architecture of the Zelle payment system means—again, unlike other payment options commonly used by American consumers— that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection.

6.      Worse, TD Bank misrepresents and omits the truth about a secret policy it has adopted:  it does not and will not reimburse its accountholders for losses via Zelle due to fraud, even where those losses are timely reported by accountholders.

7.      TD Bank was required not to misrepresent the unique and dangerous features of the Zelle service in its marketing about it and in contractual representations.  But it failed to do so.

8.      As a result, users like Plaintiffs sign up for and use the Zelle service without the benefit of accurate information regarding that service, and later end up with huge, unreimbursed losses due to fraud.  Such users never would have signed up for Zelle in the first place if they had known the extreme risks of signing up for and using the service.

9.      As a member of the Zelle network, the risks are well known to TD Bank but are omitted from all of its marketing regarding Zelle.

10.     As a recent New York Times investigation showed, fraud on the Zelle network is a widespread scourge of which banks are well aware. Quoting an industry expert, the *Times* reported:

> "Organized crime is rampant," said John Buzzard, Javelin's lead fraud analyst. "A couple years ago, we were just starting to talk about it" on apps like Zelle and Venmo, Mr. Buzzard said. "Now, it's common and everywhere."

> The banks are aware of the widespread fraud on Zelle. When Mr. Faunce called [his bank] to report the crime, the customer service representative told him, "A lot of people are getting scammed on Zelle this way." Getting ripped off for $500 was "actually really good," Mr. Faunce said the rep told him, because "many people were getting hit for thousands of dollars."

https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html  (last accessed March 28, 2022).

11.     Had Plaintiffs and the Class members known of the true operation and risks of the Zelle service—risks TD Bank alone was aware of and actively misrepresented—they would not have signed up for and used the Zelle service.

12.     Plaintiffs and the Class members have been injured by signing up for and using the Zelle service. Plaintiffs bring this action on behalf of themselves, the putative Classes, and the general public. Plaintiffs seek actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent TD Bank and Zelle from continuing to engage in its illegal practices as described herein.

## PARTIES

13.     Plaintiff Gautham Yatham is a citizen and resident of Dayton, New Jersey.

14.     Plaintiff Robert Walters is a citizen and resident of Lake Worth, Florida.

15.     Defendant TD Bank, N.A., is a federally chartered bank with its principal place of business in Cherry Hill, New Jersey.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a different State than Defendant. The number of members of the proposed Classes in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

17.      This Court has personal jurisdiction over the Defendant because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Overview

19.     It is free to sign up with Zelle, and in fact Zelle is integrated into the websites and mobile apps of TD Bank.  In marketing and within the website and app itself, TD Bank encourages its accountholders to sign up for the Zelle service—a sign up that occurs quickly within the TD

Bank website or mobile app.  During that sign-up process, a user provides basic information to Zelle to link into the Zelle network.

20.     While Zelle provides a link to what it calls a "User Agreement" on its website, at no time during the sign-up process on the bank's website or app did Plaintiffs agree to be bound by that document.

21.     Sign up for the Zelle service allows the fast transfer of account funds to other Zelle users.

22.     Created in 2017 by the largest banks in the U.S. to enable instant digital money transfers, Zelle is by far the country's most widely used money transfer service. Last year, people sent $490 billion in immediate payment transfers through Zelle.

23.     The Zelle network is operated by Early Warning Services, a company created and owned by seven banks: Bank of America, Capital One, JPMorgan Chase, PNC, Truist, U.S. Bank and Wells Fargo.

24.     The Zelle service is very popular, but it also has a massive fraud problem—in no small part because of the immediacy with which money transfers are made on the service.  If a fraudster removes money from a Zelle user's bank account, either directly or by fooling the Zelle user to transfer money, those funds are unrecoverable to the consumer.

25.     Nearly 18 million Americans were defrauded through scams involving person-to-person payment apps like Zelle in 2020 alone, according to Javelin Strategy & Research, an industry consultant.

26.     Organized crime is rampant on Zelle and other similar person-to-person transfer services.

27.     The 1,500 banks and credit unions who are members of the Zelle network, including TD Bank, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take steps to warn their accountholders of these risks—or protect their accountholders who fall prey to fraud.

28.     For example, a common scam involves a scammer impersonating a bank employee and requesting that the accountholder transfer money to a different bank account for testing purposes. Unsuspecting Zelle users, tricked into making a fraudulent transfer, in many cases send hundreds or thousands of dollars to fraudsters.

29.     In another very common scheme, a Zelle user's phone is stolen and Zelle transfers are made from the stolen phone to the fraudster.

30.     In short, and unbeknownst to average Zelle users, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists and those who use social media sites to advertise fake concert tickets and purebred puppies.

31.     Scams like these are rampant on the Zelle network precisely because of the design and architecture of the network, specifically that money transfer is instantaneous and unrecoverable. Indeed, there is virtually no recourse for consumers to recoup losses due to fraud, unlike other payment methods commonly used by American consumers—debit cards, credit cards, and checks. Zelle provides no protection for accountholders who are victims of fraud, and TD Bank provides virtually no recourse for accountholders attempting to recoup losses due to fraud.

32.     The unique, misrepresented, and undisclosed architecture of the Zelle payment system and TD Bank's own fraud policies means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection for victimized accountholders.

     **B.**     **TD Bank Falsely Markets Zelle as a Safe and Secure Way to Transfer Money,  Omits Information Regarding the Extreme Risks of Signing Up for and Using the Service, and Misrepresents Fraud Protections Regarding Zelle in its Account Contract**

33.     In its marketing about Zelle and during the Zelle signup process within the Bank's mobile app or website, the Bank makes repeated promises that Zelle is a "fast, **safe** and easy way to send and receive money" (emphasis added).

34.     It also promises: "Move money in the moment.  It's simple and **secure** – with lots of people you know" (emphasis added).

35.     At no time in its marketing or during the sign-up process does TD Bank warn potential users of the true security risks of using the Zelle service—including the risk of fraud and the risk that fraudulent losses will never be reimbursed by TD Bank.

36.     Zelle's services can cause unsuspecting consumers like Plaintiffs to incur massive losses on their linked bank accounts.

37.     TD Bank misrepresents (and omits facts about) the true nature, benefits, and risks of the Zelle service, functioning of which means that users are at extreme and undisclosed risk of fraud when using Zelle. Had Plaintiffs been adequately informed of these risks, they would not have signed up for or used Zelle.

38.     The Bank's marketing representations about Zelle—including within its app and website—misrepresent and never disclose these risks and material facts, instead luring accountholders to sign up for and use the service with promises of ease, safety and security.

39.     These representations—which all users view during the sign-up process—are false and contain material omissions.

40.     TD Bank misrepresents the true nature, benefits and risks of the service, which burden users with an extreme and undisclosed risk of Zelle causing losses due to fraud. Plaintiffs would not have used Zelle if they had been adequately informed of the risks.

41.     The Bank's misrepresentations and omissions are especially pernicious because TD Bank alone knows a crucial fact regarding Zelle transfers that occur on its accountholders' accounts:  as a matter of secret bank policy, fraud-induced Zelle transfers will almost never be reimbursed to accountholders.

42.     Indeed, upon information and belief, TD Bank maintains a secret policy whereby it refuses to reimburse fraud losses incurred via Zelle, even where its accountholders timely inform TD Bank of the fraud.

43.     It misrepresents and fails to disclose this secret policy.

44.     Further, TD's Deposit Agreement applicable to consumer accounts repeatedly promises users that, if they timely report fraud, such fraud will be fairly investigated and accountholders will not be liable for fraudulent transfers:

**Unauthorized Transfers**
Tell us AT ONCE if you believe your Card, your PIN, or both has been lost, stolen or used without your permission, or if you believe that an Electronic Funds Transfer has been made without your permission using information from your check. You could lose all the money in your Deposit Account, plus your available overdraft protection. Telephoning is the best way of keeping your possible losses down. If you notify us within two (2) Business Days after you learn of the loss or theft of your Card or PIN, you can lose no more than $50 if someone uses your Card or PIN without your permission. If you do not notify us within two (2) Business Days after you learn of the loss or theft of your Card or PIN, and we can prove we could have prevented someone from using your Card and/or PIN without your permission if you had told us, you could lose as much as $500 ($50 if you are a resident of Massachusetts and this Agreement is governed by Massachusetts law).

[…]

**Errors or Questions About Electronic Funds Transfers**
If you need information about an Electronic Funds Transfer or if you believe there is an error on your bank statement or receipt relating to an Electronic Funds Transfer, telephone

the Bank immediately at 1-888-751-9000 or write to: Deposit Operations Department P.O. Box 1377 Lewiston, ME 04243-1377.

We must hear from you no later than sixty (60) Calendar Days after we sent you the FIRST statement on which the problem or error appeared…We will complete our investigation within ten (10) Business Days after we hear from you (or within twenty (20) Business Days after we hear from you if your notice relates to a transfer that occurred within thirty (30) Calendar Days after your first deposit to the Account)…We will correct any error promptly after we complete our investigation. We will send you a written explanation within three (3) Business Days after completing our investigation. You may ask for copies of the documents that we used in our investigation and we must make these available to you for inspection.

45.     These provisions are and were reasonably understood by Plaintiffs to mean that Plaintiffs would not be liable for electronic funds transfers effectuated by fraud.

**C.     TD Bank Is Required to Follow EFTA Requirements and It Fails to Do So**

46.     The Electronic Fund Transfer Act requires banks to reimburse customers for losses on transfers that were "initiated by a person other than the consumer without actual authority to initiate the transfer."[1]

47.     An unauthorized Electronic Fund Transfer ("EFT") is an EFT from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. § 1005.2(m).

48.     Unauthorized EFTs include transfers initiated by a person who obtained a consumer's access device through fraud or robbery and consumer transfers at an ATM that were induced by force. Comment 2(m)-3 and 4.

49.     According to the Consumer Financial Protection Bureau ("CFPB"), "If a consumer has provided timely notice of an error under 12 CFR 1005.11(b)(1) and the financial institution

---

[1] Electronic Fund Transfers FAQ, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/#unauthorized-eft (last accessed June 6, 2022).

determines that the error was an unauthorized EFT, the liability protections in Regulation E section 1005.6 would apply."[2]

50.    Recent CFPB guidance on unauthorized EFTs indicates P2P payments are EFTs, such as transactions made with Zelle, and trigger "error resolution obligations" to consumers to protect them from situations where they are fraudulently induced to initiate an unauthorized EFT from a third-party.[3]

51.    The CFPB has made it clear that a transaction that is fraudulently induced by a third party is an unauthorized electronic funds transfer subject to the limitations of liability in 12 C.F.R. § 1005.6.[4]

52.    Even so, Defendant has not reversed or refunded all funds of Plaintiffs' disputed and unauthorized transactions, though obligated to do so.

53.    Because banks, such as Defendant, fail to protect consumers as widespread "fraud flourishes" on Zelle, Senators Elizabeth Warren, Robert Menendez and Jack Reed sent a letter to the CEO of Zelle noting:

> The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act Protected victims of fraudulent money transfers, **including those who were "induced" into transferring the money themselves**, while the FDIC issued a report in March 2022 finding that both the banks and the platform—in this case Zelle—were held responsible for fraudulent electronic transfers through Regulation E.

> *See* **Exhibit 1**, Warren Letter to Zelle on Scams and Fraud (emphasis added).

---

[2] *Id*.

[3] *Id*.

[4] https://www.consumerfinance.gov/rules-policy/regulations/1005/2/ ("An unauthorized EFT includes a transfer initiated by a person who obtained the access device form the consumer through fraud") (last accessed June 6, 2022).

54.     Unfortunately, TD Bank regularly fails to consider fraudulently induced Zelle transactions as "unauthorized EFTs," thus depriving accountholders of their rights to be reimbursed for such fraudulent transfers, even where the losses are timely reported by consumers.

**D.     Plaintiff Yatham's Experience**

55.     When Plaintiff Yatham signed up for Zelle he was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by users' banks or credit unions.

56.     For example, on December 8, 2021, a fraudster transferred $870 taken from Plaintiff's personal bank account using the Zelle service.

57.     Plaintiff is a young adult who was seeking employment.

58.     While browsing internship and employment websites, Plaintiff came across optnation.us ("optnation") a website purporting to offer career services and guaranteed job placement. The optnation website boasts opportunities and placement with prominent Fortune 500 companies.

59.     Interested, Plaintiff submitted his contact information and shortly after, an optnation representative reached out to Plaintiff promising training and corporate internships. The optnation representative encouraged Plaintiff to submit an application as only "qualified" candidates are selected for training and job placement. Plaintiff complied and his "application" was almost immediately accepted.

60.     To continue on, the optnation representative informed Plaintiff that it would be $900 to provide their career placement services. The optnation representative called Plaintiff persistently and pressured him to submit payment in order to be placed with a job.

61.     Plaintiff complied and attempted to pay optnation through TD Bank's Bill Pay service. However, the optnation representative advised Plaintiff that it only accepted payment via Zelle. Thus, Plaintiff placed a stop payment on the TD Bank Bill Pay transaction and incurred a $30 fee which optnation offered to deduct from the $900 service reducing his Zelle payment to $870.

62.     After being convinced to submit payment, optnation connected Plaintiff with one of its "third party vendors" for assistance with resume building. The third-party vendor, however, did not provide resume review services, but rather, advised Plaintiff that it would embellish his resume with years of experience that Plaintiff simply did not possess.

63.     Unwilling to be dishonest and lie to potential employers, Plaintiff immediately requested that optnation refund his money, but optnation refused.

64.     The same day Plaintiff was fraudulently induced to send $870 via Zelle to optnation, he called Zelle to request the transfer be cancelled. Zelle stated that it was not possible.

65.     Despite Plaintiff's multiple conversations with optnation representatives, he was never refunded and eventually, optnation blocked Plaintiff's phone number and refused to speak with Plaintiff.

66.     Plaintiff timely informed TD Bank of the fraud, but TD Bank refused to reimburse Plaintiff his losses. The TD Bank representative Plaintiff spoke with acknowledged TD Bank accountholders often fell victim to rampant fraud on the Zelle platform.

67.     Ultimately, Plaintiff opened two fraud claims with TD Bank, but both were denied and TD Bank refused to reimburse him for his fraud-induced loss.

**E.      Plaintiff Walters' Experience**

68.     When Plaintiff Walters signed up for Zelle he was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by users' banks or credit unions.

69.     For example, a fraudster received $450 taken from Mr. Walter's personal bank account after claiming that a payment the fraudster sent to Plaintiff using Zelle was unauthorized.

70.     On March 12, 2021, Plaintiff was enjoying a night out at Cheetah Pompano, a local club Plaintiff frequented often. While at the club, the fraudster, who identified himself as Jorge Cruz, approached Plaintiff and they conversed for a substantial time.

71.     During their conversation, the fraudster asked Plaintiff to give him $450 in cash and in exchange the fraudster would transfer $450 to Plaintiff's TD Bank account via Zelle.

72.     Plaintiff agreed to give the fraudster the money in cash, but only after the $450 Zelle transfer was reflected in his account.

73.     Plaintiff was comfortable receiving the funds through Zelle, as he used it for business purposes for many years.

74.     The fraudster transferred the money via Zelle and it was instantly deposited in Plaintiff's TD Bank account. Since the $450 was reflected in his checking account, Plaintiff handed the fraudster $450 in cash. After this encounter, Plaintiff never saw or heard from the fraudster again.

75.     Approximately two months later, Plaintiff noticed his bank statement indicated $450 had been subtracted from his account. The transaction was labeled "claim reversal." Confused, Plaintiff immediately contacted TD Bank to inquire about the $450 claim reversal deduction.

76.     TD Bank informed Plaintiff that the fraudster reported the $450 Zelle transfer as an unauthorized transaction and thus, the transaction amount was deducted from his bank account. Plaintiff disputed the claim reversal, recounted TD Bank of the fraud he fell victim to, and submitted his own fraud claim with TD Bank

77.     His claim with TD Bank was unsuccessful and it refused to refund Plaintiff. After denying his claim, TD Bank immediately disconnected Zelle from his checking account and suggested he report his issue to Zelle, which Plaintiff did.

78.     Zelle, however, stated that it was unable to assist with Plaintiff's fraud claim and redirected Plaintiff to file a claim with TD Bank.

79.     Neither TD Bank nor Zelle assisted Plaintiff with his fraud loss and both companies kept attempting to shift responsibility to the other.

80.     Ultimately, despite Plaintiff's timely notification, TD Bank denied Plaintiff's claims and refused to reimburse him for his fraud-induced loss.

## CLASS ALLEGATIONS

81.     Plaintiffs bring this action individually and as representatives of all those similarly situated, on behalf of the below-defined Classes:

> All persons with a TD Bank account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud (the "Class").

> All New Jersey persons with a TD Bank account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud (the "New Jersey Subclass").

> All Florida persons with a TD Bank account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud (the "Florida Subclass").

82.     Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staffs.

83.     This case is appropriate for class treatment because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

84.     **Numerosity:** The members of the Classes are so numerous that joinder of all members would be unfeasible and impracticable. The precise membership of the Classes are unknown to Plaintiffs at this time; however, it is estimated that the Classes number is greater than one hundred individuals. The identity of such membership is readily ascertainable via inspection of Defendant's books and records or other approved methods. Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

85.     **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiffs and all other similarly situated persons, which predominate over questions affecting only individual Class members, including, without limitation:

a)      Whether Defendant's representations and omissions about the Zelle service are false, misleading, deceptive, or likely to deceive;

b)      Whether Defendant failed to disclose the risks of using the Zelle service;

c)      Whether Plaintiffs and the Class members were damaged by Defendant's conduct;

d)      Whether Defendant's actions or inactions violated the consumer protection statutes invoked herein;

e)      Whether Defendant's actions or inactions violated the EFTA; and

f)      Whether Plaintiffs are entitled to a preliminary and permanent injunction

enjoining Defendant's conduct.

86.      **Predominance of Common Questions:** Common questions of law and fact predominate over questions that affect only individual members of the Classes. The common questions of law set forth above are numerous and substantial and stem from Defendant's uniform practices applicable to each individual Class member. As such, these common questions predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

87.      **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, Plaintiffs and all Class members were similarly injured through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiffs, like the members of the Classes, were deprived of monies that rightfully belonged to them. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

88.      **Adequacy of Representation:** Plaintiffs are adequate class representatives because they are fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Classes, and because their interests do not conflict with the interests of the other Class members they seek to represent. Moreover, Plaintiffs' attorneys are ready, willing, and able to fully and adequately represent Plaintiffs and the members of the Class. Plaintiffs' attorneys are experienced in complex class action litigation, and they will prosecute this action vigorously.

89.      **Superiority:** The nature of this action and the claims available to Plaintiffs and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each Class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since it would

be able to exploit and overwhelm the limited resources of each individual Plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by individual Class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual Class members against Defendant, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual Class members which would, as a practical matter, be dispositive of the interests of the other Class members not parties to adjudications or which would substantially impair or impede the ability of the Class members to protect their interests. Further, the claims of the individual members of the Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

**FIRST CAUSE OF ACTION**
**Violation of New Jersey Consumer Fraud Act ("NJCFA")**
**N.J. Stat. Ann. § 56:8-1, *et seq*.**
**(Asserted on Behalf of the New Jersey Subclass)**

90.     Plaintiff Yatham repeats and realleges the above allegations as if fully set forth herein.

91.     Defendant, Plaintiff Yatham, and the Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

92.     The New Jersey Consumer Fraud Act makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate … is declared to be an unlawful practice."  N.J. Stat. Ann. § 56:8-2.

93.     Defendant's practices, as described herein, constitute unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the advertisement of the Zelle service utilized by Plaintiff and New Jersey Class Members, in violation of the NJCFA, including by knowingly and intentionally making false or misleading representations that it provides "safe" and "secure" Zelle money transfer service through its website and mobile app.

94.     Defendant, as described herein, violated the NJCFA, by knowingly and intentionally concealing and failing to disclose material facts regarding the true risks of utilizing the Zelle money transfer service through its website and mobile app.

95.     Defendant's practices, as described herein, constitute deceptive and/or fraudulent business practices in violation of the NJCFA because, among other things, they are likely to deceive reasonable consumers, who expect their bank to fully investigate and protect fraudulent losses incurred using the Zelle service. Moreover, Defendant's willful and intentional concealment and omission of the security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by NFCU as a matter of secret policy, is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

96.     Defendant committed deceptive and fraudulent business acts and practices in violation of the NJCFA, by affirmatively and knowingly misrepresenting on its website and mobile app the true risks and operation of its service.

97.     Defendant's business practices have misled Plaintiff and the proposed New Jersey Class and will continue to mislead them in the future.

98.     Plaintiff relied on Defendant's misrepresentations.

99.     Plaintiff and the New Jersey Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and the New Jersey Class members did not, and could not, unravel Defendant's deception on their own.

100.     Had Plaintiff known the true risks of using the Zelle service, he never would have signed up for and used the Zelle service.

101.     As a direct and proximate result of Defendant's deceptive and fraudulent business practices, Plaintiff and New Jersey Class members suffered and will continue to suffer ascertainable loss and actual damages. Defendant's fraudulent conduct is ongoing and present a continuing threat to New Jersey Class members that they will be deceived into making money transfers with the Zelle service.

102.     Plaintiff and New Jersey Class members seek an order enjoining Defendant's unfair and deceptive acts or practices in violation of the NJCFA and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the NJCFA.

**SECOND CAUSE OF ACTION**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. § 501.201, *et seq*.**
**(Asserted on Behalf of the Florida Subclass)**

103.     Plaintiff Walters repeats and realleges the above allegations as if fully set forth herein.

104.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. The stated purpose of the FDUTPA is to "protect the consuming public … from those who engage in unfair methods of competition, or unconscionable,

deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

105.    Plaintiff Walters and members of the Florida Class are "consumers" as defined by Fla. Stat. § 501.203(7).

106.    TD Bank engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8) by offering the Zelle money transfer services through its website and mobile app.

107.    As described herein, TD Bank's misrepresentations that it provides safe, secure, Zelle money transfer services through its website and mobile app constitutes an unconscionable, unfair and/or deceptive act in trade or commerce in violation of Fla. Stat. § 501.201.

108.    As described herein, TD Bank's misrepresentations that it will protect accountholders who incur fraud losses via Zelle, even where its accountholders timely inform TD Bank of the fraud, constitutes an unconscionable, unfair and/or deceptive act in trade or commerce in violation of Fla. Stat. § 501.201

109.    TD Bank's deceptive omission of the material security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by TD Bank as a matter of secret policy, is a practice that is likely to mislead a consumer acting reasonably under the circumstances, to the consumer's detriment.

110.    As a direct and proximate result of TD Bank's unfair, unconscionable, and/or deceptive acts or practices, Plaintiff and members of the Florida Class have been harmed and suffered actual damages.

## THIRD CAUSE OF ACTION
### Breach of Contract
### (Asserted on Behalf of the Classes)

111.    Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

112.    Plaintiffs  and members of the Classes contracted with TD Bank for checking account services, as embodied in the Deposit Agreement.

113.    TD Bank breached the terms of its contract with consumers when as described herein, TD Bank failed to fairly investigate reported fraudulent transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

114.    Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

115.    Plaintiffs and members of the Classes have sustained monetary damages as a result of TD Bank's breaches of the contract.

<u>FOURTH CAUSE OF ACTION</u>
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Asserted on Behalf of the Classes)**

116.    Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

117.    Plaintiffs and members of the Classes contracted with TD Bank for checking account services, as embodied in the Deposit Agreement.

118.    Under the laws of each state Defendant conducts business, an implied covenant of good faith and fair dealing govern every contract. For banking transactions, this is also mandated by the Uniform Commercial Code that has been adopted in each state. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

119.    This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

120.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely

the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

121.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

122.     TD Bank breached the covenant of good faith and fair dealing as explained herein.

123.     Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

124.     Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them pursuant to the Deposit Agreement.

125.     Plaintiffs and members of the Classes have sustained monetary damages as a result of each of Defendant's breaches of the covenant of good faith and fair dealing.

### FIFTH CAUSE OF ACTION
**Violation of the Electronic Fund Transfer Act ("EFTA")**
**(Asserted on Behalf of the Classes)**

126.     Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

127.     The Electronic Fund Transfer Act and Regulation E apply to electronic fund transfers that authorize a financial institution to debit or credit a consumer's account. 12 C.F.R. § 1005.3(a).

128.     The primary objective of the EFTA is "the protection of individual consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b).

129.     Defendant is a financial institution. 12 C.F.R. § 1005.2(i).

130.     "If a financial institution, within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. § 1693d(a), (c), or (d)] or notification pursuant to [15 U.S.C. § 1693d(d)] receives oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C. § 1693d(b)], the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred," the financial institution is required to investigate the alleged error. 15 U.S.C. § 1693f(a).

131.     After said investigation, the financial institution must determine whether an "error" has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. 15 U.S.C. § 1693f(a).

132.     A financial institution that provisionally recredits the consumer's account for the amount alleged to be in error pending an investigation, however, is afforded forty-five (45) business days after receipt of notice of error to investigate. *Id*. § 16993f(c).

133.     Pursuant to the EFTA, an error includes "an unauthorized electronic fund transfer." *Id*. § 1693f(f).

134.     An Electronic Fund Transfer ("EFT") is any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(b)(1). Accordingly, Regulation E applies to any person-to-person ("P2P") or mobile payment transactions that meet the definition of EFT. 12 C.F.R. § 1005.3(b)(1)(v); *id*., Comment 3(b)(1)-1.ii.

135.     Unauthorized EFTs are EFTs from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. § 1005.2(m).

136.     According to the Consumer Financial Protection Bureau, when a third party fraudulently induces a consumer into sharing account access information that is used to initiate an

EFT from the consumer's account, that transfer meets Regulation E's definition of an unauthorized EFT.[5]

137.    In particular, Comment 1005.2(m)-3 of Regulation E explains that an unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through robbery or fraud. As such, when a consumer is fraudulently induced into sharing account access information with a third party, and a third party uses that information to make an EFT from the consumer's account, the transfer is an unauthorized EFT under regulation E. 12 C.F.R. § 1005.2(m), Comment 1005.2(m)-3.

138.    Here, Plaintiffs and Members of the Classes were fraudulently induced by third-party scammers to make unauthorized money transfers from their TD Bank accounts.

139.    After the unauthorized EFTs were made, the EFTs appeared on the bank statements of Plaintiffs and Members of the Classes.

140.    Plaintiffs and Members of the Classes notified Defendant of these errors within sixty (60) days of their appearances on their accounts.

141.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Members of the Classes were unable to reclaim the account funds taken from scammers from unauthorized EFTs.

142.    Defendant knowingly and willfully concluded that the transfers of funds via Zelle on accounts of Plaintiffs and Members of the Classes were not in error when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

143.    Defendant intentionally determined that the unauthorized transfer of funds via Zelle on accounts of Plaintiffs and Members of the Classes were not in error due to, at least in part, their financial self-interest as a stakeholder in Zelle.

---

[5] "Electronic Fund Transfers FAQs," Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/#financial-institutions-2 (last accessed June 6, 2022).

144.    Defendant refused to reverse or refund funds to Plaintiffs and Members of the Classes.

145.    As such, Plaintiffs and Members of the Classes are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of Defendant; and (iv) reasonable attorneys' fees and costs. *Id*. §§ 1693f(e)(2), 1693m(a)(2)(B)–(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A.    Certifying the proposed Classes, appointing Plaintiffs as representative of the Classes, and appointing counsel for Plaintiffs as lead counsel for the respective Classes;

B.    Declaring that Defendant's policies and practices as described herein constitute a breach of contract, and a breach of the covenant of good faith and fair dealing or unjust enrichment, a violation of the consumer protection statutes invoked herein, and/or a violation of the Electronic Fund Transfer Act.

C.    Enjoining Defendant from the wrongful conduct as described herein;

D.    Awarding restitution of all fees at issue paid to Defendant by Plaintiffs and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

F.    Awarding actual and/or compensatory damages in an amount according to proof;

G.    Punitive and exemplary damages;

H.      Awarding pre-judgment interest at the maximum rate permitted by applicable law;

I.      Reimbursing all costs, expenses, and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

J.      Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated:  June 21, 2022                                     Respectfully Submitted,

**DAPEER LAW, P.A.**

*/s/ Rachel Edelsberg*
Rachel Edelsberg, Esq.
New Jersey Bar No. 039272011
3331 Sunset Avenue
Ocean, New Jersey 07712
Telephone: 305-610-5223
rachel@dapeer.com

Scott Edelsberg*
Christopher Gold*
**EDELSBERG LAW, PA**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
scott@edelsberglaw.com
chris@edelsberglaw.com

Andrew J. Shamis*
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiffs and the Proposed Class*